## Pare v. Renfro, et al.

### (Decided November 30, 1917.)

### Appeal from Barren Circuit Court.

1. Husband and Wife—Gifts.—Where a husband permitted his wife to collect money from his business and retain and treat it as her own, it will be treated as a gift to her which will not be set aside after his death at the suit of a daughter.

2. Attorney and Client—Fees—Estates.—The attorneys for distributees who successfully surcharged an administratrix's settlement will be allowed a reasonable fee for their services, to be paid out of the estate.

W L. PORTER for appellant.

BAIRD & RICHARDSON and C. H. HATCHETT for appellees.

OPINION OF THE COURT BY JUDGE MILLER—Reversing.

Charles B. Pare, of Glasgow, Ky., died in April, 1908, leaving his widow, Docia Pare, and two daughters, Nellie and Mary Pare, surviving him. At the time of their father's death Nellie was twenty-six and Mary was nineteen years old. The widow, Docia Pare, qualified as administratrix of her husband's estate. She made a county court settlement of her accounts as administratrix in May, 1910, which showed that she had in her hands the sum of $5,760.15. The widow was entitled to one-half of this balance and Nellie and Mary were each entitled to one-fourth of it, or $1,442.28. Nellie gave her mother a receipt for her share, which was used as a voucher in the settlement; but it is conceded by both parties that her mother did not, at that time at least, pay Nellie anything. Of the funds in her hands Docia invested $4,800.00 in the purchase of an undivided half interest in a building known as the Pare-Emerson Building, taking the title to herself. Docia continued to manage the estate, Nellie acting as bookkeeper and general assistant to her mother.

In September, 1914, Nellie married Charles Renfro, and in June, 1915, she instituted this action against her mother for the purpose of surcharging her settlement of 1910, alleging that her mother as administratrix had not accounted for the whole estate that had passed into her hands.

In her answer and counter-claim Docia Pare not only denied that she had failed to account for her husband's entire estate that came into her hands, but she alleged that Nellie, before her marriage had helped and assisted her mother in making the settlement in the county court; that she knew what was included in the estate; and, that after the settlement had been made she ratified it by giving a receipt for her part of the surplus then on hand.

By way of avoiding the plea of ratification Nellie replied that there was an agreement between herself, her sister Mary, and her mother, that in order to save costs all of the estate was not to be reported or accounted for, and that they were to divide the residue thus withheld between them; and, that part of the estate was omitted from the county court settlement pursuant to the agreement. The rejoinder controverted the reply in this respect, and Mary, who had married Gabbard, and her mother both denied that they ever made the contract imputed to them by Nellie. And, since the entire estate be-

longed to the three, it would seem that the contract, if made as claimed by Nellie, was a useless performance.

In settling the accounts the commissioner charged the administratrix with the King place, valued at $2,250.00; the Pare-Emerson Building, valued at $4,800.00; and the Pare-Terry Building, valued at $6,500.00, the three aggregating $13,550.00. The plaintiff also asked, among other things, that her mother be charged with the Hatcher note for $1,552.50; school bonds valued at $2,300.00; two United States bonds worth $1,000.00; and a cash deposit in bank of $1,105.00.

The commissioner declined, however, to charge the administratrix with the last four items, but treated them as her own. He, however, charged the administratrix with $5,000.00 in cash, which she had in her box in the bank vault at the time of her husband's death in 1908; and he allowed the plaintiff's attorneys a fee of $1,000.00, and the defendant's attorney $500.00, all to be paid out of the estate. There is no controversy about the rents received, or taxes, insurance, or repairs paid. Nellie kept the books showing each item of receipts and disbursements, and the master's report, in these respects was confirmed without exception. The administratrix was also charged with $1,000.00, the proceeds of a life insurance policy upon her husband's life and payable to his estate; and, of this charge she does not complain. She readily admitted the receipt of the money, thinking the policy was payable to Charles B. Pare's wife; and upon her attention having been called to the mistake she consented to the correction.

From the judgment confirming the report Docia Pare appeals, complaining only of the charge against her for the $5,000.00 deposited in the box in the bank, which she claims as her own, and the attorneys' fees as above indicated. No other questions are raised upon this appeal.

1. When Charles B. Pare and Docia were married, nearly forty years ago, he was a brickmason and she was a seamstress. Both were unusually frugal and industrious. He seems to have been rather slow intellectually, while his wife was a bright woman, possessing unusual financial ability. He subsequently became a brickmaker, and his wife assisted him in running the brickyard for many years. She also continued to sew for her neighbors; raised and sold vegetables, chickens, eggs, milk and butter; and, when her husband was not at the brickyard she sold brick and with her own hands helped load them on the wagons.

As they saved money they invested it so well that at the time of his death they had accumulated an estate of more than $25,000.00, largely comprised of some of the best paying real estate in Glasgow. Throughout their married life, however, he permitted her to collect money from rents, for brick sold, and from other sources of revenue, and to retain a substantial share thereof as her own. These savings she treated and handled as her own, with his consent. He had confidence in her ability as a financial manager; and, in this respect, the results show that his confidence was not misplaced.

The only direct evidence relating to the $5,000.00 in question and its ownership is found in the testimony of Docia Pare, who says the money was her own and not her husband's, and that it had been acquired by her in the way above indicated. The appellees took her deposition, and in that way only was the amount of money that she had on hand at the time of her husband's death ascertained, and the way in which she acquired and held it. It is true her daughter Nellie says that her mother had no property at all at the time of her father's death; but this is a mere conclusion unsupported by the proof, since it is clearly shown that her mother did then have property, and had had property in a substantial measure for many years.

This fact appeared from the testimony of W. B. Smith, cashier of the First National Bank of Glasgow, who had known Docia Pare for thirty years, and gave her an excellent character for financial ability. Cashier Smith testified that Docia Pare had $2,000.00 on deposit in his bank as early as 1892, and that this money was paid to her; that she kept her money in her own name and in a separate account from that of her husband, who also had an account with the bank at the same time. Cashier Smith further testified that in March, 1907, before the death of her husband, Docia Pare had $500.00 on deposit with his bank; that on May 27, 1907, she deposited $500.00; on October 25, she deposited $1,000.00; and that other deposits made between December 20, 1906, and January 20, 1908, aggregated $2,506.90. All of these deposits were made before her husband's death in April, 1908.

Other witnesses testified to the industry and business ability of Docia Pare. Her sister, Mrs. Mary Pare, testified that Docia was very industrious; that she sewed saddles for her husband and that he paid her money for

it; that she sold milk, butter, chickens, eggs, wove car-
pets, loaded brick at the brickyard, sewed, did fancy nee-
dle work and embroidery of all kinds, took care of her
money, and kept it separate from that of her husband.
Mrs. Mary Pare further testified that in 1900 she bor-
rowed $500.00 from her sister Docia, giving her a mort-
gage to secure it, and that she subsequently repaid the
money, and that Charles B. Pare knew all about it.

W. D. Pare, a brother of the decedent, testified that
during the lifetime of his brother he borrowed $105.00
from Docia Pare; that she gave him her own check for it;
that he secured it by a mortgage on land; and that he
repaid her the money before his brother's death.

It is argued that it is an unusual thing for one to put
$5,000.00 in money in the vault of a bank for safe keep-
ing instead of depositing it as a general deposit with
the funds of the bank in the ordinary way. It is, how-
ever, no uncommon practice; and, Docia Pare gives her
reason for making this specific deposit. When the De-
posit Bank of Glasgow failed in about 1890 she and her
husband had money deposited in that institution. Profit-
ing by her experience, she bought two small tin boxes,
one for her husband and one for herself, and had her
name painted on one, and his name on the other. He put
his money in his box, and she put her money in her box,
and they so kept their moneys until the bank was re-
organized under the name of the First National Bank.
They then rented a box in the vault of the new bank and
put their money in the box, separated, however, so as
to distinguish her money from his. She says her hus-
band used his money thus deposited in erecting the build-
ings owned by him at the time of his death, except
$5,700.00, which he loaned the Terry-Hughes Company.
This last amount she collected after his death and ac-
counted for it in her settlement. She says that she, how-
ever, kept her money in the bank, and that this is the
money with which she was charged and of which she now
complains.

It thus appears that eight years before her husband's
death she had $2,000.00 to her credit in the First National
Bank where she had other substantial transactions in
the way of deposits; and the conclusion is not at all un-
reasonable that during all these years she has continu-
ally added to her savings and that she had as much as
$5,000.00 in 1908. Docia Pare's testimony is the only
evidence on the subject; and, if it is sufficient to show
that she had the money, is it not sufficient proof in the

absence of any contradiction that it belonged to her as she claimed it did?

The only testimony tending to contradict Docia Pare is that of her daughter Nellie, who said her mother never had any money and never did anything except keep house. This, however, is a mere assertion on her part and is clearly shown to be erroneous in every substantial respect, since it is shown that twenty years before the death of her husband, she had a separate estate of her own in the form of money deposited in the bank aggregating $2,000.00. But it is insisted that Docia Pare could not have earned this comparatively large sum of money by her small exertions and limited opportunities of making money.

It is, however, no answer to Mrs. Pare's claim to this money to say that she did not earn it. She may not have earned it; but if her husband gave it to her or permitted her to keep it as her own, it was as much her money as if she had earned it or derived it from some other source.

In many families there exists the commendable rule that the wife by her economy, frugality and strict attention to her domestic duties, does as much as the husband towards saving whatever he may be said to have accumulated. The law, in a measure, recognizes this fact by making provision for her out of the estate taken in his name, notwithstanding his will to the contrary. So, if the husband does voluntarily that which the law would do in a less degree, and his creditors are not thereby prejudiced, there is no reason why his act should be disturbed. McWethy's Admx. v. McCright, 141 Ky. 816. We do not mean to say that the proof shows all the money here in controversy was given to the wife by her husband; but it does show that for years he allowed her to collect money from the brickyard business and keep it as her own, and that she handled the money acquired in this and other ways, most advantageously.

The question therefore is not so much how she obtained it, but to whom did it belong? In our opinion the weight of the evidence shows that it belonged to the wife; and, we are not disposed to deprive her of it upon the mere suggestion or suspicion of a discontented daughter who for more than six years before her marriage acted as her mother's bookkeeper and presumably knew all about her father's estate.

2. The fee of $1,000.00 to the plaintiff's attorney was based largely upon the idea that plaintiff had re-

covered about $11,000.00 for the estate. In this, however, the counsel are in error as the amount recovered under the judgment of the circuit court was between six and eight thousand dollars, and that judgment was erroneous. Under the circumstances we are of the opinion that the fee for the plaintiff's attorneys should be fixed at $500.00; and that the fee of $500.00 to the attorney of the defendant should stand as fixed—both to be paid out of the estate.

Judgment reversed and action remanded with instructions to the circuit court to set aside so much of the judgment as charges Docia Pare with the $5,000.00 and allows the plaintiff's attorneys a fee of $1,000.00, and to enter a judgment in accordance with this opinion.